IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NOVA CHEMICALS, INC. )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SEKISUI PLASTICS CO., LTD., )<br>)<br>Defendant. ) | **2:06cv478**<br>**Electronic Filing** |

# OPINION

Nova Chemicals, Inc. ("Nova" or "plaintiff"), commenced this action seeking declaratory relief concerning the parties' rights and duties under a license agreement, and more specifically its right to market and sell certain products in what the parties defined as "the Asian market." Through a counterclaim Sekisui Plastics, Co., LTD ("Sekisui" or "defendant"), seeks injunctive relief and restitution for an alleged breach of the agreement, which governed Nova's use of Sekisui's patented and confidential technology and the sale of the resultant products. The breach purportedly occurred when Nova began selling products in the Asian countries seven years after the agreement expired. Presently before the court are cross motions for summary judgment. For the reasons set forth below, plaintiff's motion will be granted and defendant's motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to defendant  establishes the background set

forth below. Sekisui originally entered into the license agreement ("the agreement") with Arco Chemical Company ("ARCO") on December 9, 1982, in Philadelphia, Pennsylvania. Sekisui and ARCO prepared and exchanged multiple drafts of and made numerous revisions to the agreement during its negotiation and drafting. The principal negotiators were Dr. Joseph Verdol on behalf of ARCO and Fumio Saito on behalf of Sekisui. All negotiations were in English with a Japanese translator for the benefit of Sekisui. ARCO prepared the final version in English.

The parties indicated that the agreement would be governed by the laws of Pennsylvania. Upon payment of an initial lump sum the agreement granted ARCO an exclusive license with a limited right to sublicense from January 1, 1983, to January 1, 1986, to use Sekisui's specified patents and technologies in the United States and Canada "to produce, sell and use" the resulting products. Under Paragraphs 5.2 and 5.3 ARCO had a right to exercise an option to extend and expand the license in Sekisui's patents and technologies for a period of up to ten additional years by making an additional lump sum payment and then ongoing royalty payments. ARCO exercised the option by letter dated February 20, 1985. It paid all royalties during the ten year extension. The agreement terminated on February 20, 1995. On or about September 30, 1996, the agreement was assigned to Nova as a part of an asset purchase agreement.

The agreement granted a license to use and sublicense Sekisui's "Piocelan process", which encompassed a pentane-based technology for producing polyethylene/polystyrene foams and polypropylene/polyethylene foams. It included use of Sekisui's patented technology and the confidential trade secrets, know-how and equipment needed to use Sekisui's intellectual property and produce marketable products. Presently, Nova markets products which incorporate the Piocelan technology under the "ARCEL" trade name. Nova began selling ARCEL products in the Asian market in 2002.

The parties dispute whether the license agreement currently prohibits Nova's sales in the Asian market. The dispute is centered on two sections of the agreement. The first is Paragraph 5.4, which provides:

3

> Following the payment by ACC to Sekisui of said money under Paragraph 6.1 (a) (3), an exclusive license with the right to sublicense is automatically granted to ACC during the term of this agreement under all [enumerated Sekisui patents and technologies] to produce, sell and use all PRODUCTS and other resinous materials in the LICENSED TERRITORY. Moreover, ACC and its sublicense shall have the right to sell PRODUCTS and other resinous materials in all countries of the world except in the following [specified Asian countries].

The second is Article XI:

> This Agreement shall become effective on the EFFECTIVE DATE and shall remain in full force and effect for a period of ten (10) years from the date of exercise by ACC of the option in Paragraphs 5.2 and 5.3, unless this Agreement is terminated earlier as provided in Paragraph 5.6 or ARTICLE IX. Upon payment of the Lump Sum Payment and Running Royalties due under Paragraph 6.1, ACC shall have a fully paid-up right and license to use and sublicense [the enumerated Sekisui patents and technologies] in any of its United States and/or Canadian plants and to sell PRODUCTS and other resinous materials produced anywhere in the world (subject to Paragraph 5.4).

Nova contends that all provisions of the licence agreement expired in 1995 and that Sekisui is attempting to enforce a right that does not exist under any reasonable interpretation of the agreement. It asserts that the parties did not intend the agreement to govern ARCO's rights to use the technology and sell the resultant products in the Asian countries. Those countries were simply identified as being beyond the affirmative grant of the license and the parties' rights and duties as to those countries were and are controlled by independent sources, namely Sekisui's patent and trade secret rights. In the alternative, even if the sections of the agreement are read to prohibit sales in the enumerated Asian countries, the prohibition does not extend in perpetuity. The agreement comprehensively was tailored so that all of the parties' rights and obligations expired upon its termination. This effect was consistent with the applicable Pennsylvania Law which does not favor an interpretation that creates a perpetual commitment in the absence of a clearly expressed provision that reflects an intent to do so.

Nova contends that the agreement is clear and unequivocal and its provisions reflect the intent of the parties. The agreement is not ambiguous because it is neither susceptible of different constructions, nor capable of being understood in more than one sense. None of its provisions is obscure or has a double meaning. The provisions lead only to the interpretation set

4

forth above and thus, the court has no need to look to extrinsic evidence to interpret the agreement. But even if extrinsic evidence is considered, there is no competent evidence to prove that any prohibition against sales in the Asian market was to be permanent. This is because the duration of the restriction was never discussed during negotiations and ARCO's representatives were not aware of any intent by Sekisui to have any aspect of the agreement extend beyond its termination. Therefore, Nova seeks a declaration that it has no remaining obligations under the agreement.

Sekisui alleges that the exception clause in Paragraph 5.4 prohibits sales in the Asian countries and that prohibition was intended to be permanent. Mr. Stoves, one of ARCO's drafters and negotiators, clearly understood this. In other words, the parties affirmatively intended to prohibit sales in the Asian market and the clause may not be interpreted as simply designating territory that was beyond the scope of the license. Furthermore, the clause was intended to survive the termination of the agreement. It is separated from the section defining ARCO's rights in paragraph 5.4 and thus constitutes an independent provision which is not subject to the termination clause in the first sentence of Article XI. It, therefore, reflects a perpetual prohibition that the parties did not expressly displace or extinguish in the agreement and it extends in perpetuity under Pennsylvania law. Consequently, the agreement continues to prohibit Nova from selling its ARCEL products in the Asian market.

In support of its interpretation, Sekisui also maintains that the provisions of the agreement are clear an unequivocal. It asserts that the second sentence of the "Term and Termination" Article exclusively governs Nova's rights reflected in Paragraph 5.4 after the termination and thus the prohibition against sales should be interpreted as extending in perpetuity. From its prespective, the disputed provisions of the agreement are not ambiguous and the parties' principal negotiators "agreed" that the "prohibition clause" would survive the term of the agreement and continue indefinitely. And even if the available extrinsic evidence is considered, it only bolsters Sekisui's interpretation of the agreement. Thus, it asserts that

5

specific performance and restitution for Nova's prohibited sales are warranted.

Nova counters that Article XI bound ARCO to pay "Running Royalties" during the term of the agreement and thus the provision filled a gap in Paragraph 5.4 which only required ARCO to pay a lump sum royalty. Furthermore, Article XI granted ARCO rights which were not affirmatively granted under Paragraph 5.4. Therefore, the parties were only expressly defining the duration of ARCO's rights under the agreement in the second sentence of Article XI and did not seek to establish a prohibition of any kind. In other words, if they had intended the sentence to govern the parties' rights after termination, they would have inserted more specific language reflecting that intent.

For a variety of reasons, the common law has long recognized that as a general matter interpretation of a written agreement is a task to be performed by the court rather than a jury. Gonzalez v. U. S. Steel Corp., 398 A.2d 1378, 1385 (Pa. 1979). Adherence to this approach "contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike." Id. (quoting Restatement (Second) of Contracts § 283, Comment d (Tent. Draft No. 5, March 1970)).

It is also well established that the intent of the parties to a written agreement is to be ascertained in the first instance from the writing itself, and where the words contained in the written instrument are clear and unambiguous, the intent as reflected in the expressed language chosen by the parties must be given effect. Martin v. Monumental Ins. Co., 240 F.3d 223, 232-33 (3d Cir. 2001). "[T]he focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). Ascertaining the intent of the parties is a question of law under such circumstances. Seven Springs Farm, Inc. v. Croker, 801 A.2d 1212, 1216 (Pa. 2002) (quoting Community College of Beaver County v. Community College of Beaver ,, 375 A.2d 1267, 1275(Pa. 1977)); Restatement (Second) of Contracts § 212 Comment d. In contrast, when the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a

question of fact for a jury. Community College of Beaver County, 801 A.2d at 1275; Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994).

Where the potential for an ambiguity arises, it is proper to consider any extrinsic evidence offered by the parties and inquire into the circumstances surrounding the execution of the document "in an effort to clarify the meaning that the parties sought to express in the language which they chose." Burns Mfg. Co., Inc., v. Boehm, 356 A.2d 763, 766 n.3 (Pa. 1976); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). It is only when consideration of the extrinsic evidence surrounding the execution of the contract does not resolve the potential ambiguity that resort to the rules of construction is appropriate. Id.; Eastern Associated Coal Corp. v. Etna Casualty & Surety Co., 632 F.2d 1068, 1075 (3d Cir. 1980).

"[A] contract is ambiguous under Pennsylvania law 'if, and only if, it is reasonably or fairly susceptible of different constructions and capable of being understood in'" more than one sense. Glenn Distributors v. Carlisle Products, 297 F.3d 294, 300 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 614 (3d Cir. 1995)). Such an ambiguity may arise where the provisions or terms used "are obscure in meaning through indefiniteness of expression" or have a double meaning. Id.

Where the parties have integrated their agreement into a single written document, all prior negotiations and understandings concerning the agreement are excluded by the parole evidence rule to the extent they contradict, modify or change the express terms of the agreement. Martin, 240 F.3d at 233 (citing Nocolella v. Palmer, 248 A.2d 20 (Pa. 1968)). In contrast, parole evidence is admissible to establish the meaning of ambiguous terms in a writing, whether or not the writing is integrated. Id. (citing Mellon Bank, N.A. v. Etna Business Credit, 619 F.2d 1001, 1010 (3d Cir. 1980)). Nevertheless, it is appropriate when interpreting an integrated agreement to consider the negotiations of the parties, including statements of intention and even positive understandings, so long as they are used to show the meaning of the writing and not to contradict or attempt to add terms to the agreement. Daset Mining Corp. v. Industrial Fuels Corp., 473 A.2d

7

584, 593 (Pa. Super. 1984); Restatement (Second) of Contracts § 212, Comment c.

In resolving a dispute about the parties' intent the court is to avoid ascribing an interpretation that conflicts with the plain meaning of the language used by the parties or otherwise alters the clear import of the contract. Amoco Oil Co. v. Snyder, 478 A.2d 795, 798 (Pa. 1984). Similarly, provisions of a contract are not to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given. Continental Ins. Co. v. McKain, 820 F. Supp. 890, 897 (E.D. Pa. 1993), aff'd, 19 F.3d 642 (3d Cir. 1994); Sparler v. Firemen's Ins. Co., 521 A.2d 433, 438 (Pa. Super. 1987).

In its prior opinion the court acknowledged that there were at least two plausible ways to interpret the exception clause of Paragraph 5.4: either (1) the parties were simply acknowledging that the Asian countries were not included in the license or (2) it was understood that ARCO had agreed not to sell in the excluded countries (for either a set or indefinite period). The first interpretation was noted to be the most plausible. Nevertheless, in light of the tabula rasa upon which the court had to consider these alternatives in conjunction with the standards governing a motion to dismiss, it was compelled to recognize that through discovery Sekisui might be able to establish a set of facts that would support its interpretation of the agreement. After considering the parties' pleadings and proffered evidence at summary judgement, it is unequivocally clear that there is only one reasonable interpretation of the agreement: the parties were acknowledging that the Asian market was beyond the scope of the non-exclusive right to sell being affirmatively granted by the licence and after termination of the agreement the parties' rights and duties in that portion of the world would be left to the operation of independent sources of law, such as Sekisui's patent and trade secret rights. Virtually every aspect of the record supports this assessment.

First, the plain meaning of the language chosen in the disputed sections as well as the context in which the agreement arose demonstrate that the parties were defining the scope of the grant of rights being conveyed by the license, and not identifying independent consideration

8

being given by ARCO to acquire those rights.  The plain meaning of the first sentence in Paragraph 5.4 indicates that in exchange for a lump sum payment Sekisui was granting to ARCO an exclusive license to *produce, use, and sell* all products made with the enumerated technologies *during the term of the agreement*.  This bundle of rights was conveyed to ARCO only in the "Licensed Territory," which was defined as the United States and Canada ("the North American market").  ARCO's rights to sell the resulting products had been limited to the North American Market during the initial three year term of the Agreement.  See Agreement (Doc. No. 84-3) at ¶ 5.1.  The second highlighted sentence of Paragraph 5.4 extended the right to *sell* the resulting products non-exclusively "in all countries of the world except" the specified Asian market.  Paragraph 5.4 thus plainly and unequivocally defined the nature and territorial scope of the two separate sets of rights being conveyed by the license upon exercise of the exclusive option.

The rights delineated by Paragraph 5.4 significantly expanded the rights conveyed during the first three years of the license.  The exercise of ARCO's "exclusive" option extended the license for an additional ten years, gave ARCO an unrestricted right to sublicense in the North American market, and significantly expanded its right to sell the resulting products beyond the North American market.  See Agreement at ¶ 5.4.  These rights arose "following the payment by" ARCO of the initial lump sum of $500,000.00 called for in Paragraph 6.1(a)(3) and were not conditioned upon any other payment or the relinquishment of any other right.  Id.  Paragraph 5.4 thus was limited to defining the type and territorial scope of the rights conveyed by the license in the first instance and did not attempt to define in any manner the duration of the agreement.

The parties entered the agreement with the expressed understanding that there was no developed market in the United States and Canada for the products that would be produced with the use of Sekisui's patented technologies and know-how.  See Agreement at ¶ 5.3.  Against this backdrop Paragraph 5.4 affirmatively identified the grant of rights ARCO would receive under the license and their territorial reach so ARCO could then determine,  based on the results from

9

its efforts to develop the North American market, whether it wanted to exercise its exclusive option to extend the agreement for ten additional years. It was essential to define the rights that ARCO would acquire in exercising its option and paragraph 5.4 affirmatively accomplished this important task.

By defining the nature of the rights and their territorial scope, the parties necessarily limited their reach. For example, by definition ARCO did not acquire the right to build a plant and manufacture the contemplated products on the continent of Africa or to sub-license the technology in the country of Australia. Affirmatively identifying the reach of the rights conveyed under the agreement thus expressly defined what was and what was not included. The exception clause of Paragraph 5.4 was merely part of this undertaking.

Article XI defined the duration of the rights conveyed in Paragraph 5.4. As an initial matter those rights arose on the "EFFECTIVE DATE," which was the payment of the lump sum royalty. It also signified that they would remain in full force for ten years in the event ARCO exercised its ten year option unless the agreement was terminated by (1) ARCO's decision to relinquish its exclusive license in the North American market within the first three years or (2) twelve months of non-performance passed after one party declared a "Force Majeure" and then other party elected to give written notice of termination.

Article XI further conditioned the ongoing validity of the conveyed rights during the duration of the ten year extension. That condition was expressed as the payment of the running royalties identified in Paragraph 6.1, which were based on the volume of production achieved by ARCO during the extension. It did this by declaring that upon payment of both the initial lump sum royalty and ongoing running royalties as these arose, ARCO would have "a fully paid up right and license" to continue its exclusive operations in the North American market and its non-exclusive right to sell everywhere else except in the enumerated Asian countries.

Article XI thus affirmatively identified the conditions under which the rights granted in Paragraph 5.4 would continue in the event ARCO elected to exercise its option for a ten year

extension: those conditions were that the agreement not have been terminated through either of the two provisions permitting early termination and ARCO made all additional running royalty payments as they became due.  Once again, the parties reflected on and expressed affirmatively the rights that were being conveyed under the license and the conditions that were required to be satisfied in order for those rights to remain effective.

Paragraph 5.4 and Article XI reflect a clear intent to define the scope, territorial reach and duration of the grant of rights being conveyed by the ten year option in the license.  The conditions precedent to the exercise of those rights was affirmatively identified as the payment of two types royalties.  Nowhere was it expressed that ARCO was required to give other independent consideration for the acquisition of those rights.  Thus, the clear import of the language chosen by the parties indicates that the Asian market simply was beyond the affirmative grant of selling rights being conveyed.

The above approach was consistent with the context in which the agreement was created. The parties were attempting to create a license agreement, which by its very nature conveys permission to engage in commercial activities that one party has the exclusive right to control as a matter of law.  A license is understood to be an instrument that gives "permission to commit some act that would otherwise be unlawful." Black's Law Dictionary, 7th ed. 1999.  The focus in creating such an instrument is on what is being affirmatively conveyed and given, with it being understood that all things pertaining to the exclusive rights not affirmatively transferred continue to reside in the licensor, i.e., it remains unlawful for the licensee to engage in such activities or undertakings.  In this setting it is only natural for the parties to focus their attention on the rights affirmatively being granted and the conditions under which those rights would remain effective. This is precisely what the parties did in Paragraph 5.4 and Article XI of the agreement.

Defendant's efforts to convert the parties' affirmative definition of the non-exclusive selling rights being conveyed into an independent form of consideration being exchanged for those rights is misplaced.  In the setting in question it is true that anything not conveyed by the

grant of rights remains unlawful, and thus the licensee is prohibited from engaging in such activities. Defendant is, therefore, correct when it argues that "whether the Asian countries were prohibited or 'simply not included' is the same thing." Defendant's Brief in Opposition (Doc. No. 92) at 14-15. Where defendant errs, however, is in its dogmatic belief that the exception clause is rendered superfluous if it is not construed as an independent prohibition. At the time the agreement was drafted, it remained unlawful for ARCO to sell the Products in the Asian countries, not because of the license agreement, but because of Sekisui's intellectual property rights. Thus, the exception clause necessarily had independent meaning and purpose: to define that which was affirmatively being conveyed.

Although the effort to do so has been nothing short of Herculean, defendant's attempt to manufacture an ambiguity in the meaning of the exception clause in Paragraph 5.4 is misplaced. Defendant notes that plaintiff's witnesses all agreed that the clause was a prohibition against sales. But the witnesses' indication that the clause excepting the Asian market was or would be "a prohibition on sales" amounts to nothing more than an acknowledgment that at its core a license agreement functions by conveying the rights affirmatively granted to the licensee and reserving all rights not affirmatively granted in the licensor. Such a view is indicative of the general understanding of those who work in the area involving the use of intellectual property and trade secrets. It is a prohibition, not by operation of the license per se, but by the implicit recognition that all activities pertaining to the licensor's exclusive rights not transferred to the licensee continue to reside in the licensor and it remains unlawful for the licensee to engage in such activities or undertakings. Of course, the unlawfulness of such activities does not emanate from the license, but from what the license does not authorize in conjunction with the licensor's exclusive rights under independent sources of law. Consequently, consideration of the testimony indicating the exception clause was a prohibition against sales in the Asian market does not change the parties' clear intent to define affirmatively the territorial reach of the non-exclusive right to sell acquired upon exercise of the ten year option.

Moreover, even assuming for the sake of argument that the exception clause is to be read as a prohibition against sales, it is clear that the parties intended the prohibition to expire upon termination of the agreement. The structure of the agreement and every aspect of its implementation compel this recognition.

Tellingly, the parties defined the duration of ARCO's obligation to keep confidential all Sekisui technology and trade secret know-how gained by carrying out the agreement. In Article IV, the parties identified what information could become confidential and when ARCO would have an obligation to keep such information secret and confidential. In Paragraph 4.5, the parties expressly defined the duration of ARCO's secrecy obligations: for a period of five years in the event ARCO terminated the agreement during the first three years of operation or in the event written notice was given twelve months after a declared Force Majeure; otherwise all such obligations were to "remain effective ... for a period of ten (10) years from the date of exercise by [ARCO] of the option in Paragraphs 5.2 and 5.3." Agreement at ¶ 4.5. Consequently, the parties agreed that the core aspects of Sekisui's exclusive rights would enjoy protection only for the ten years constituting ARCO's exercise and fulfilment of its exclusive option.

The parties expressly crafted a five year period of protection for Sekisui's confidential and trade-secret information in the event ARCO terminated the agreement during or at the end of the first three years. They thus identified and addressed an area where they believed the agreement needed to provide restrictions that extended beyond its termination.

In the event the ten year option was exercised, ARCO's obligations to maintain confidential and secret the technology and trade-secret know-how covered by the license existed co-extensively with ARCO's rights under the license and its obligation to make running royalty payments. Thus, all ARCO's obligations regarding the acquired confidential information terminated on or about February 20, 1995.

The parties had contemplated a scenario where the agreement needed to impose an affirmative restriction/prohibition beyond its termination and demonstrated their ability to

provide for such measures. No aspect of the agreement was expressly identified as extending beyond the duration of the ten year option in the event it was exercised. Thus, there is no textual or structural support for Sekisui's position that sales in the Asian market were recognized as being a prohibition in perpetuity.[1]

Defendant's attempt to change the second sentence of Article XI from a provision defining the conditions pursuant to which the rights granted under the extension would remain effective into a provision specifying rights that would continue after termination equally is lacking in textual support. As aptly noted by plaintiff, the second sentence of Article XI conditioned the ongoing enjoyment of the rights conveyed under the extension on the payment of "running royalties," thereby signifying what was necessary to maintain those rights during the duration of the agreement. Defendant's arguments to the effect that the parties were attempting to identify affirmative restrictions that would survive the agreement are premised on substituting the first two words of the sentence signifying that "[u]pon payment ... [ARCO] shall have a fully paid-up right and license" with the words "upon termination." Of course, the parties did not use the words "upon termination" to start the second sentence of Article XI and this court is without factual or legal authority to render such an interpretation. See Amoco Oil, 478 A.2d at 798 ("[T]his Court long ago emphasized that '[t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with ... the accepted and plain meaning of the language used.'") (quoting Hagarty v. William Akers, Jr. Co., 20 A.2d 317 (Pa. 1941) and Felte v. White Global Franchise, 302 A.2d

---

[1] In this regard there is much force to plaintiff's contention that if the parties intended to prohibit sales permanently, they would have inserted a separate paragraph or article in the agreement to address such an important matter or at least would not have incorporated the affirmative covenant accomplishing the measure in the paragraph which affirmatively conveys the right to sell. For example, the parties easily could have inserted a separate section or sentence with more specific language signifying that "upon termination of the agreement ARCO shall continue to" or "upon payment of the Lump Sum Payment and all Running Royalties it is understood that ... " or "ARCO shall continue to recognize Sekisui's exclusive right to sell PRODUCTS in the Asian countries for __ years after the termination of this agreement," etc.

14

347, 351 (Pa. 1973)); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980) (it is error to transgress the point where contract interpretation becomes alteration).

Furthermore, Pennsylvania law does not support defendant's perpetual prohibition construction. Sekisui contends that absent an express provision on the duration of the prohibition clause it extends in perpetuity. Its construction is in conflict with the applicable Pennsylvania law.

It has long been recognized "that contractual provisions should not be construed to create a perpetual term unless such intention is expressed in clear and unequivocal terms." Wyoming West School District v. Northwest School District, 695 A.2d 949, 953 (Pa. Super. 1997) (citing Leet v. Vinglas, 531 A.2d 17, 21 (Pa. Super. 1987); Hutchison, 519 A.2d at 390, n. 5 ("a lease will not be construed to create a perpetual term unless the intention is expressed in clear and unequivocal terms.") (citing Sterle v. Galiardi Coal & Coke Co., 77 A.2d 669, 672 (Pa. Super. 1951)). As explained above, there is no expressed or even implied basis to support the notion that the agreement sought to impose a permanent prohibition on sales in the Asian market. Thus, adopting defendant's construction would be in contravention of Pennsylvania law.[2]

---

[2]It would also raise a serious question about the ongoing validity of the agreement under federal law. The Supreme Court long ago held that

> any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws.

Brulotte v. Thys Co., 379 U.S. 29, 31 (1964). And while Brulotte has been roundly and perhaps justly criticized with regard to its prohibition against continuing royalty payments beyond the term of the patent, see e.g., Scheiber v. Dolby Laboratories, Inc., 293 F.3d 1014, 1017 (7th Cir. 2002) (Posner, J.), it has not been overruled. Defendant's interpretation clearly raises the inference that as a patentee Sekisui was entitled to extract a form of consideration and extend thereon part of its monopoly beyond the patent's legal duration without distinguishing between the patent and post-patent periods, a proposition which the Supreme Court found particularly troubling in Brulotte. Brulotte, 379 U.S. at 32.

Defendant's reliance on <u>Rossmassler v. Spielberger</u>, 112 A. 876, 880 (Pa. 1921) and <u>American Type Founders, Inc. v. Lanston Monotype Machine Co.</u>, 45 F. Supp. 531 (E.D. Pa. 1942) to displace the above principle of law is unavailing. <u>Rossmassler</u> involved an action in equity concerning voting rights of corporate stock and a series of transactions affecting the ownership of that stock as part of an effort to keep the corporation afloat in the face of serious financial difficulties. In one of many agreements the financier and individual who ultimately acquired the stock had agreed "to reserve annually from the net profits $25,000 to be paid to [the old stockholders] before payment of any dividends ...." <u>Rossmassler</u>, 112 A. at 880. Once the company enjoyed a return to profitability the provision was attacked as "so indefinite and uncertain as to be incapable of enforcement" due to the lack of a term of duration in the agreement. <u>Id.</u> at 879-80. The court rejected the notion that the contract should be held void for uncertainty where it was possible to deduce the term from the subject-matter of the parties' undertaking. <u>Id.</u> at 880. The passage from the case cited by Sekisui merely addressed the argument by the appellee that without a definite term of duration the obligation to pay out of corporate profits before dividends should be subject to unilateral revocation or termination. The court rejected this proposition because the subject-matter and circumstances of the transaction demonstrated that the contract's term of duration was co-extensive with the existence of the corporate stock. <u>Id.</u>

<u>Rossmassler</u> provides no support for Sekisui's position on the duration of the agreement and/or the function of the exception clause in conjunction therewith. As explained above, the agreement contained expressed provisions defining its duration and the circumstances in which it was executed support only the view that any limitation on the rights granted therein were not intended to survive the agreement in the event it became fully executed. Thus, <u>Rossmassler</u> actually lends support to the instant disposition by this court.

<u>American Type Founders</u> is of similar import. It also considered and rejected the argument that a contract that does not contain a definite term of duration should be construed as

reflecting an intent to be revocable or subject to termination upon reasonable notice by either party, reasoning that the circumstances indicated the contract was "not cancellable at the will of either party, and plaintiff's attempt to declare it terminated [was] ineffective." American Type Founders, 45 F. Supp. at 535. The court's resolution was based on the failure of proof by the party seeking to establish that the agreement gave it a unilateral right to terminate, a proposition which it also found to be sufficiently undermined by the subject-matter of the agreement and the circumstances surrounding the transaction. Id. at 534-35.

While American Type Founders did involve the interpretation of a license agreement, it addressed the rules of interpretation governing cancellation where no term of duration was established in the agreement or by the parties' course of dealings. Its teaching are inapposite to the instant matter where the parties expressed the duration of the license in clear terms and structured the entire agreement in accordance with that expressed understanding.

Finally, consideration of there entire body of extrinsic evidence proffered by Sekisui does not undermine in any meaningful way the disposition of the parties' dispute set forth above. As previously noted, many of ARCO's employees acknowledged that the exception clause meant that ARCO was precluded from making sales in the Asian market. But even if this testimony were to be interpreted in a manner divorced from the fundamental way a license agreement functions, there is no competent evidence to support the view that the parties objectively agreed that such a prohibition would continue beyond the expiration of the agreement.

Mr. Stoves, who was ARCO's employee and helped negotiate the agreement testified that at the time of negotiations he understood the exception clause to reflect a prohibition against sales in the specified countries. Mr. Kozak, ARCO's employee and a draftsman of the agreement, also testified that the parties intended to restrict sales in the Asian countries. And Dr. Verdol acknowledged that the exception clause that the effect of creating a prohibition against sales. But each of these witnesses also testified that it was understood or would have been apparent to all involved that the restriction of sales was co-extensive with the duration of the

17

agreement as opposed to being permanent.

Mr. Saito, Sekisui's main negotiator, admitted that Dr. Verdol never specifically agreed or acknowledged in any way that the exception clause reflected a prohibition against sales that would extend forever. Absent an expressed acknowledgment of such an understanding, Dr. Verdol could not have silently "agreed" to the perpetual duration of the restriction as alleged by Sekisui. Mr. Hama, another of Sekisui's negotiators, similarly testified that he did not even recall a discussion about the duration of ARCO's inability to make sales in the Asian market. Under these circumstances Dr. Verdol and the other negotiators and drafters on behalf of ARCO could not have been aware of Sekisui's silent intention to prohibit sales perpetually. Consequently, the court is compelled to give effect to the intent of the parties as reflected objectively through the terms of the agreement they chose to manifestly express, rather than as, perhaps, Sekisui silently intended.

For the reasons set forth above, plaintiff's motion for summary judgment will be granted and the court will issue a declaration that the license agreement does not prohibit Nova's sales of Piocelan-based products in the Asian market. Defendant's motion will be denied. An appropriate order will follow.

Date: September 3, 2008

                                                  s/ David Stewart Cercone
                                                  David Stewart Cercone
                                                  United States District Judge

cc:    John M. McIntyre, Esquire
        Kevin S. Katona, Esquire
        Jayme L. Butcher, Esquire
        Reed Smith
        435 Sixth Avenue
        Pittsburgh, PA 15219

Michael J. McCaney, Jr., Esquire
Flamm, Boroff & Bacine, PC
794 Penllyn Pike
Blue Bell, PA 19422

Robert J. Diaz, Esquire
Hahn Loeser & Parks
200 Public Square
3300 BP Tower
Cleveland, OH 44114